FILED

2022 Nov-30  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **TYRONE C. THOMPSON,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No.:** |
| ) | |
| **JOHN Q. HAMM,** ) | |
| **Commissioner, Alabama** ) | |
| **Department of Corrections,** ) | |
| ) | |
| **PHYLLIS MORGAN,** ) | |
| **Warden** ) | |
| **Donaldson Corr. Fac.,** ) | |
| ) | |
| **Respondents.** ) | |

## PETITIONER'S BRIEF IN SUPPORT OF HIS PETITION FOR A WRIT OF HABEAS CORPUS BY PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254

Petitioner, Tyrone Christopher Thompson, AIS # 251188, is currently incarcerated at the William E. Donaldson Correctional Facility in Bessemer, Alabama, in the custody of Warden Phyllis Morgan, and the Alabama Department of Corrections and Commissioner John Q. Hamm. Mr. Thompson has been convicted of two counts of capital murder in violation of Ala. Code § 13A-5-40(a)(1) and Ala. Code § 13A-5-40(a)(2). With respect to these Alabama convictions and sentences, Mr. Thompson

is confined in violation of the Constitution and laws of the United States. He, therefore, files this petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his convictions. Mr. Thompson respectfully asks this Honorable Court to issue a writ of habeas corpus vacating his convictions and, in support thereof, states as follows:

## I.     INTRODUCTION

Mr. Thompson makes application to this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Mr. Thompson was convicted of two counts of capital murder in violation of Ala. Code § 13A-5-40(a)(1) and Ala. Code § 13A-5-40(a)(2). This Court must grant Mr. Thompson's petition due to the constitutional violation Mr. Thompson has suffered and the State of Alabama's refusal to grant him relief based upon clearly established federal law.

## II.    PROCEDURAL HISTORY

### A. Trial and Appeal

1.  Pre-trial proceedings

On April 20, 2011, an Anniston, Alabama teacher named Kevin Thompson went missing.[1] Three nights later, authorities found his body,

---

[1] No relation to the defendant, Mr. Thompson.

stabbed to death and with serious cuts, abrasions, and bruises, off the embankment of a highway. (R. 1165:3-21; 1169:4-6.)[2] On May 13, 2011, local authorities arrested Tyrone Thompson in connection with Kevin Thompson's death. (C. 38.) That same day, Tyrone Thompson was indicted on two counts of capital murder, namely murder in the course of a kidnapping and murder in the course of a robbery. (C. 37.) Sometime later, Mr. Jovon Gaston and Mr. Nicholas Smith were arrested and similarly charged as co-defendants. (See R. 998:11-13.) On June 27, 2011, Mr. Thompson notified the trial court of "his intent to pursue a special plea of not guilty by reason of insanity." (C. 53.)[3]

On August 14, 2014, defense counsel filed an ex parte motion for the appointment of an expert to assist in determining whether Mr. Thompson suffers from an intellectual disability, in order to prepare an Atkins[4] defense. (C. 381-403.) Over the course of the next year, on three

---

[2] "C." denotes the clerk's record; "R." denotes the reporter's transcript; "S." denotes the reporter's supplemental transcript, which is a revised transcript of the July 9, 2019 pre-trial hearing and replaces pages 629 through 813 of the original reporter's transcript.

[3] This defense is currently referred to as the affirmative defense of "mental disease or defect." The terms are used herein interchangeably.

[4] Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (holding that executing people with intellectual disabilities violates the Eighth Amendment's ban on cruel and unusual punishment).

separate occasions, the trial court denied Mr. Thompson the appointment of his own expert for psychological evaluation. Each time, Mr. Thompson filed a petition for writ of mandamus to the Alabama Court of Criminal Appeals, and each time, the Alabama Court of Criminal Appeals reversed or vacated the trial court's denial.

First, on October 20, 2014, over the defense's objections, the trial court permitted the State to attend a hearing and present evidence and argument against defense counsel's ex parte motion. (R. 165:24-167:13.) Three days later, the trial court denied Mr. Thompson motion, finding that he had failed to make a preliminary showing that he required an Atkins expert. (C. 485-93.) The defense petitioned for mandamus because the State should not have been present at the hearing. The Alabama Court of Criminal Appeals agreed and, on February 19, 2015, directed the trial court to hold an ex parte hearing. Ex parte Sealed Case, Calhoun Circuit Court No. CC-11-491, Order (Feb. 19, 2015).

Second, on March 12, 2015, the trial court held the ordered ex parte hearing (R. 346:9-16), but the trial court once again denied the defense's request for an expert, finding that Mr. Thompson had failed to make a preliminary showing that he suffered a mental disability. (See C. 535.)

On April 21, 2015, the defense again petitioned for mandamus, requesting that the Alabama Court of Criminal Appeals order the trial court to grant the defense's motion for funds for a mental health expert. On July 23, 2015, the Alabama Court of Criminal Appeals ruled that Mr. Thompson had shown that expert expenses were warranted, (C. 535-36), and directed the trial court to grant the defense's motion.

Third, on October 26, 2015, the defense submitted an ex parte motion for the appointment and funding of Dr. Carol Walker as its expert, but on January 26, 2016, the trial court instead ordered that the State's expert, Dr. Glen King, perform the evaluation. (C. 550.) On April 6, 2016, the defense filed a third petition for mandamus, asking for funding for and appointment of Dr. Carol Walker. On April 11, 2016, the trial court amended its order to direct Taylor Hardin Secure Medical Facility, an Alabama State hospital and maximum-security forensic facility, to perform the evaluation. (C. 551.) On the same day, the trial court granted the defense's motion to appoint and fund Dr. Carol Walker as an expert. On November 8, 2017, the Alabama Court of Criminal Appeals vacated the trial court's order that Taylor Hardin Secure Medical Facility perform the evaluation. Ex parte Sealed Case, Calhoun Circuit Court No. CC-11-

491, Order (Nov. 8, 2017). Given that the trial court had "finally granted" funding for Dr. Walker, the Alabama Court of Criminal Appeals found the defense's remaining request moot. Id. at 3.

Relying on Dr. Walker's expert report, on July 20, 2018, the defense moved to prohibit the death penalty under Atkins based on Mr. Thompson's intellectual disability. (C. 638-42; see also C. 643-84.) On December 3, 2018, the State's expert Dr. King completed his expert evaluation, finding that, inter alia, Mr. Thompson's IQ is between 56 and 59, Mr. Thompson's IQ places him in "the lowest 1% with regard to intellectual ability relative to his same age peers," (C. 863-71), and Mr. Thompson suffered from an intellectual disability (C. 871). On December 21, 2018, the defense amended and renewed its motion to prohibit the death penalty in light of the findings of the State's expert. (C. 872-77; see also C. 878-83.) On January 7, 2019, the parties stipulated to remove the death penalty as a potential punishment because Mr. Thompson suffered from a significant intellectual disability. (C. 893-98; see also (C. 957-58 (order granting motion for judicial finding of intellectual disability).)

On May 6, 2019, the State filed a motion in limine to "preclude testimony on the Defendant's intellectual disability and/or mental

-6-

illness," which the defense opposed. (C. 940; C. 951-56.) The trial court heard the State's motion on May 22, 2019, and scheduled a pretrial evidentiary hearing on July 9, 2019, to determine whether the defense could present evidence of Mr. Thompson's defense of not guilty by reason of severe mental disease of defect. (See C. 950.)

Both experts testified—and agreed—that Mr. Thompson had a "mental defect" at the time of the alleged crime. (See C. 1140-42.) The State's expert also opined on the ultimate issue of mental disease or defect and whether Mr. Thompson appreciated the wrongfulness of his actions: "Q. And so that second prong is not met, and your opinion as an expert, there is no mental disease or defect defense available to him under that circumstance, correct? A. That would be my opinion, yes." (S. 702:17-21.) Mr. Thompson's expert, on the other hand, testified only as to the character of Mr. Thompson's mental disability, not whether the defense should be available to him because she believed that that question was best suited for the jury. (S. 784:5-14 ("Q. Now, I am not asking you to give an opinion, but I'm asking you, the second prong the judge is going to rule on, what are y'all taught as to that opinion? A. It is for the trier of fact to make the decision, and while people very often

render assistance to the trier of fact, there is specific areas that should be evaluated, and we're told basically if to steer clear of those kinds of situations.").) No lay witnesses testified at the hearing.

After hearing from the two experts, the Court ruled from the bench that Mr. Thompson would not be able to raise a defense of mental disease or defect to the jury. The Court credited Dr. King's testimony but did not discuss Dr. Walker's conflicting testimony or expert report.

> [T]he testimony before the Court by Dr. Glenn King was that the defendant did understand the nature of the offense, and the quality of his acts. [5] His testimony is that the offense was premeditated. [6] Dr. King's testimony was that the offense was goal directed. Dr. King's testimony

---

[5] In contrast, Dr. Walker testified that Mr. Thompson "is very concrete in his interactions" and that "[h]e does not think abstractly." (S. 769-70.) "Concrete is a parent tells a child be good. Good is abstract." Id. "[Dr. Walker:] [O]ne of the more interesting conversations I had with him was when he could not understand why he was terminated from a job for showing up late. He thought he should have been able to just complete a shift and move on. So he didn't have that ability to think forward to how that might affect his coworkers and that sort of thing." (S. 771.)

[6] Dr. Walker again testified in contrast: "Q. And how did he score - and you may have answered this, and I apologize for the repeat. But how did he score in the area of planning? [Dr. Walker:] Well, remember I had told you that there is not one that specifically measures planning. It is the ability to focus your attention and to solve problems. So his scores - let me go to those. His scores were overall in the range that you would expect given his IQ." (S. 782:2-11.)

was that the defendant avoided apprehension. [7]
Dr. King testified that all of these factors indicated
that Tyrone Thompson understood the
wrongfulness of his conduct. So, based on all of the
evidence and the law, it is clear to the Court that
from the evidence, the defendants have not proven
by that required burden of proof, clear and
convincing evidence, that the defendant - that the
mental defect cause the defendant to act so that he
could not understand the wrongfulness of his
conduct.

So the evidence of Insanity will not go to the jury.
It will not be an issue for the jury to decide, and
any evidence of the moderate mental retardation
or intellectual disability will not be presented to
the jury in any form or fashion.

(S. 810:3-811:2.) The trial court did not address the conflicting testimony

of Dr. Walker in the order following the hearing. (C. 1140-42 (neither

citing to nor discussing Dr. Walker's testimony addressing the second

prong).)

The next day, the trial court issued an order denying Mr.

Thompson's plea of not guilty by reason of mental disease or defect and

prohibiting the defense from directly or indirectly presenting any issue

---

[7] Dr. Walker explained in her report that "[c]onsistent with the
capabilities of an 8–11-year-old child, an individual with mild
[intellectual disability] can hide facts when they perceive it to be to their
advantage or the advantage of others." (C. 959-89 at 979.) Dr. Walker's
report was entered into evidence at the hearing. (S.776.)

of mental disease or defect to the jury. (<u>Id</u>.) The decision stated that Mr. Thompson failed to "prove" his affirmative defense by a showing of "clear and convincing evidence" before submitting any evidence of it to the jury. (<u>Id</u>.) Mr. Thompson filed a motion to reconsider the court's ruling, which was denied. (R. 965-967.)

### 2. Trial Proceedings

Mr. Thompson's nine-day jury trial began on August 19, 2019. (<u>See</u> R. 816:20.) Consistent with the trial court's pre-trial order, Mr. Thompson did not present any evidence regarding his mental disease or defect.

At trial, the State's evidence showed that Kevin Thompson left home or was abducted on April 20th, was robbed, was bound in duct tape, and was driven to an embankment where he was killed. Later, his car was stripped of his possessions, some of which were pawned.

On August 29, 2019, the State concluded the presentation of its case. Despite the presentation of the testimony of sixty-three witnesses and a ten-and-a-half-hour video recording of Mr. Thompson's interviews with the police, (see R. 2667:15-20, 2671:12.), the State's evidence only established that 1) Mr. Thompson introduced the co-defendants to the

victim; 2) Mr. Thompson was present at the robbery; 3) Mr. Thompson remained with the co-defendants that evening; 4) Mr. Thompson did not contact the police; and 5) Mr. Thompson remained in contact with the co-defendants after that night. The State did not present any evidence suggesting that Mr. Thompson was an active participant or derived any benefit from Kevin Thompson's murder.

After the State rested, Mr. Thompson filed a motion for acquittal, arguing, inter alia, that the trial court the decision, based on conflicting expert testimony, to preclude Mr. Thompson from putting forth any evidence of mental disease or defect, denied him of his right to a fair trial (C. 1080-88; see R. 2627:20-22, 2630.) This motion was denied. (R. 2639:15-2641:24.)

That same day, the jury convicted Tyrone Thompson of one count of murder during kidnapping in the first degree and one count of murder during a robbery in the first degree (R. 2747:3-12), and the trial court sentenced Mr. Thompson to life imprisonment without the possibility of parole, in addition to certain fines. (R. 2750:7-20.)

### 3. Alabama Court of Criminal Appeals Decision

On September 4, 2019, Mr. Thompson filed a motion for a new trial (C. 1158), which was denied by operation of law when the trial court did not rule on it within sixty days of pronouncement of sentence. Ala. R. Crim. P. 24.4. Mr. Thompson timely appealed.

On appeal, Mr. Thompson argued, inter alia, that the decision made at the pre-trial hearing to preclude him from presenting any evidence of his affirmative defense of not guilty by reason of mental disease defect at trial violated his right to Due Process and made the judge—rather than the jury—the finder of fact. (See Doc. 2-1, Brief of the Appellant, Alabama Court of Criminal Appeals, at 22-45; Doc. 2-2, Reply Brief of the Appellant, Alabama Court of Criminal Appeals, at 3-10.)

The State filed a brief in opposition, asserting, inter alia, that Mr. Thompson was required to "prove" both prongs of the affirmative defense to the trial court before he could present the defense of mental disease or defect to the jury," (Doc. 2-3, Brief of the Appellee, Alabama Court of Criminal Appeals, at 27-28); and that the circuit court's "ultimate decision to disallow the defense was correct because, even under the

correct standard of 'slight evidence,' the defense failed to establish the second prong of the test for presenting that defense." (see id. at 25-26)).

On January 29, 2021, the Alabama Court of Criminal Appeals affirmed the conviction in a memorandum opinion. (See Doc. 2-4, Memorandum Opinion, at 7-13.) That Court found that the trial court had applied the incorrect legal standard to determine if Mr. Thompson's mental defect rendered him unable to appreciate the nature and quality or wrongfulness of his actions. (Doc. 2-4, at 11 (noting that "the circuit court used the 'clear and convincing' standard instead of the applicable 'some evidence' standard"). Nonetheless, the Court of Criminal Appeals found that the error was harmless because 1) Mr. Thompson "did not present evidence sufficient to submit a defense of not guilty by reason of mental disease or defect to the jury" and 2) "Thompson has made no specific showing of evidence that he was unable to present prior to trial." (Id. at 11-13.)

### 4.  Further Direct Appeal Proceedings

On February 26, 2021, Mr. Thompson petitioned the Alabama Court of Criminal Appeals for a rehearing, which was overruled on March

12, 2021. (Doc. 2-5, Application for Rehearing; Doc. 2-6, Order Denying Application for Rehearing).

Mr. Thompson then petitioned the Alabama Supreme Court for a writ of certiorari, which was denied on May 14, 2021, with a certificate of judgment issuing the same day. (Doc. 2-7, Petition for Writ of Certiorari to Supreme Court of Alabama; Doc. 2-8, Certificate of Judgment).

Mr. Thompson finally petitioned the Supreme Court of the United States for a writ of certiorari, which was denied on December 6, 2021. 142 S. Ct. 590 (Mem).

## III.   JURISDICTION

To challenge a state conviction in federal habeas proceedings, petitioners must show that they are (1) in custody (2) as a result of a state conviction and that (3) their detention violates federal law, treaties, or constitutional principles. 28 U.S.C. § 2254(a). Here, Mr. Thompson satisfies all these jurisdictional requirements. First, Mr. Thompson is incarcerated with the Alabama Department of Corrections. See Rule 1, of the Rules Governing Section 2254 cases. Second, Mr. Thompson is incarcerated as a result of the state convictions he is challenging in this petition. Mr. Thompson exhausted these claims by raising them on

appeal to the Alabama Court of Criminal Appeals and then presenting them in a petition for writ of certiorari to the Alabama Supreme Court and ultimately, the Supreme Court of the United States. See O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731, 144 L. Ed. 2d 1 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."); Picard v. Connor, 404 U.S. 270, 275–76, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971) (exhaustion of state court remedies requires presentation of the same claim to the state court that is presented in federal court); Castille v. Peoples, 489 U.S. 346, 351, 109 S. Ct. 1056, 1060, 103 L. Ed. 2d 380 (1989) (habeas petitioner musts fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or collateral review).

In Alabama, this means that a petitioner must "assert the [federal] claim on direct appeal or in a Rule 32 proceeding, appeal any adverse ruling, seek rehearing in the Alabama Court of Criminal Appeals, and file a petition for writ of certiorari in the Alabama Supreme Court." Shapley v. Thomas, No. 3:11-CVB02434-WMA-JH, 2014 WL 4470700, at *4 (N.D. Ala. Sept. 4, 2014) (citations omitted); see Smith v. Jones, 256

F.3d 1135, 1138 (11th Cir. 2001) ("[I]n order to exhaust state remedies as to a federal constitutional issue a petitioner is required to file a petition for discretionary review in the state's highest court raising that issue, if discretionary review is part of the appellate procedure in the state …") (citations omitted)). Mr. Thompson has done so here. The case number for his trial in the Calhoun Circuit Court is CC-2011-491, his Court of Criminal Appeals case number on direct appeal is CR-18-1161, the case number for the denial of his petition for writ of certiorari by the Alabama Supreme Court on direct appeal is No. 1200442, and the case number for the denial of his petition for writ of certiorari by the Supreme Court of the United States is 21-550, reported at <u>Thompson v. Alabama</u>, 211 L. Ed. 2d 366, 142 S. Ct. 590 (2021). Finally, Mr. Thompson's convictions and future detention violate the United States Constitution and laws as detailed below.

## IV.   STANDARDS OF FEDERAL HABEAS REVIEW

Mr. Thompson filed this federal habeas petition after April 24, 1996, and, as such, this case is governed by 28 U.S.C. § 2254 as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("ADEPA").

The Eleventh Circuit has extensively described the standard of review under § 2254 as follows:

> Generally, AEDPA bars federal courts from granting habeas relief to a state habeas petitioner on a claim that was adjudicated on the merits in state court unless the state court's adjudication:
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d).

"Clearly established" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta," of the Supreme Court's cases at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). "Contrary to" means the state court applied "a rule different from the governing law set forth in [Supreme Court] cases, or [ ] it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002). An "unreasonable application" under § 2254(d)(1) occurs when a state court decision (1) "identifies the correct

governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 407. The "'unreasonable application' inquiry ... ask[s] whether the state court's application of clearly established federal law was objectively unreasonable," <u>id</u>. at 409, 120 S.Ct. at 1521, which "requires the state court decision to be more than incorrect or erroneous." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S. Ct. 1166, 1174, 155 L. Ed. 2d 144 (2003); <u>see also</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 101, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004))).

However, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007) (citation and quotation omitted).

Further, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits."

Greene v. Fisher, 565 U.S. 34, ———, 132 S. Ct. 38, 44, 181 L. Ed. 2d 336 (2011). Section 2254(d)(1) requires federal courts to "focus [ ] on what a state court knew and did" and to evaluate the reasonableness of the state court's decision "against [the Supreme] Court's precedents as of the time the state court render[ed] its decision." Cullen v. Pinholster, 563 U.S. 170, 182, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011) (quotation omitted).

When evaluating whether a state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under § 2254(d)(2), "[w]e may not characterize ... state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" Brumfield v. Cain, 576 U.S. 305, ———, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (second alteration in original) (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010)). Section 2254(d)(2), like § 2254(d)(1), requires that federal courts afford state court factual determinations "substantial deference." Id. If "[r]easonable minds reviewing the record might disagree about" the state court factfinding in question, "on habeas review that does not suffice to supersede" the state court's factual determination. Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006). We also presume findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of

correctness applies to only the underlying factual determinations." Tanzi v. Sec'y, Fla. Dep't of Corr., 772 F.3d 644, 651 (11th Cir. 2014).

In sum, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." White v. Wheeler, 577 U.S. 73, ——, 136 S. Ct. 456, 460, 193 L. Ed. 2d 384 (2015) (per curiam) (quotation omitted). But the Supreme Court has explained, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003). "Deference does not by definition preclude relief." Id. "[I]f a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." Trevino v. Thaler, 569 U.S. 413, ——, 133 S. Ct. 1911, 1917, 185 L. Ed. 2d 1044 (2013).

Once a federal court determines that a state court decision is unreasonable under § 2254(d), "we are unconstrained by § 2254's deference and must undertake a de novo review of the record." Adkins v. Warden, Holman CF, 710 F.3d 1241, 1255 (11th Cir. 2013) (quotation omitted).

Daniel v. Comm'r, Alabama Dep't of Corr., 822 F.3d 1248, 1258–60 (11th Cir. 2016).

## V.   CLAIM FOR RELIEF

**The circuit court denied Mr. Thompson his Fourteenth Amendment right to present a complete defense when it precluded him from presenting any evidence of an affirmative defense of mental disease or defect to a jury based solely on conflicting expert testimony at a pre-trial hearing.**

The circuit court denied Mr. Thompson his right to present a complete defense when it disallowed him from presenting evidence regarding mental disease or defect. In doing so, the circuit court deprived Mr. Thompson of his fundamental constitutional right to due process and a fundamentally fair trial.

Mr. Thompson has consistently argued that the circuit court's decision to preclude him from presenting any evidence of an affirmative defense of mental disease or defect to a jury was error. In turn, the state courts' decisions denying Mr. Thompson relief are both "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "[were] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Accordingly, this Court must grant Mr. Thompson habeas corpus relief. Here is why.

The Fourteenth Amendment to the United States Constitution provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Ala. Code § 13A-3-1(a) provides in pertinent part: "It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts."

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986)). "The right to present witnesses in one's own defense in a criminal trial lies at the core of the Fifth and Fourteenth Amendments' guarantee of due process of law." Boykins v. Wainwright, 737 F.2d 1539, 1544 (11th Cir. 1984). "[V]iolation of the constitutional

guarantee that an accused be able to present witnesses in his own defense is prejudicial per se." Id. at 1545 n.2 (citing United States v. Hammond, 598 F.2d 1008, 1013 (5th Cir.), on reh'g, 605 F.2d 862 (5th Cir. 1979)).

Just as critically, the availability of an insanity defense is firmly entrenched in the historical tradition and common law. As the United States Supreme Court recently explained, "for hundreds of years jurists and judges have recognized insanity (however defined) as relieving responsibility for a crime." Kahler v. Kansas, 206 L. Ed. 2d 312, 140 S. Ct. 1021, 1030 (2020). Indeed, insanity, as a "principle of nonculpability appeared in case after case involving allegedly insane defendants, on both sides of the Atlantic." Id.

To be sure, the Eleventh Circuit[8] has clearly spoken on this issue and held that excluding expert testimony relevant to establishing an

---

[8] There does appear to be a circuit split in this regard, with the Ninth Circuit at least having held that evidence relevant to a defendant's insanity defense can be excluded pre-trial and before it is presented to the jury unless it meets a sufficiency test—in particular, a "convincing clarity" standard. See United States v. Keen, 96 F.3d 425, 426 (9th Cir.), opinion amended on denial of reh'g, 104 F.3d 1111 (9th Cir. 1996), as amended on denial of reh'g (Jan. 2, 1997). However, the Keen defendant did not raise the precise due process issue presented here. Still further yet, Boykins is from this circuit, and is the better-reasoned decision that is consistent with fundamental Constitutional principles.

insanity defense renders the proceeding fundamentally unfair. <u>Boykins</u>, 737 F.2d at 1544. In <u>Boykins,</u> the trial court made an evidentiary ruling excluding expert testimony regarding the defendant's "previous history of mental illness." <u>Id.</u> at 1543. The trial court ruled that the testimony was "not relevant to [defendant's] mental condition at the time of the offense." <u>Id.</u> at 1541. The Eleventh Circuit—while noting that it was reluctant to second-guess state court evidentiary rulings— reversed and remanded, finding that "the trial court's limitation of the scope of a key defense witness's testimony denied the petitioner the right to present witnesses in his own defense in violation of the due process clause of the Fourteenth Amendment." <u>Id.</u> at 1540.

As the <u>Boykins</u> court wrote:

> We hold that Dr. Rodriguez's excluded testimony was material in that it was a crucial, critical, highly significant factor in Boykins's defense. Boykins's sole defense at trial was insanity. The record indicates that Dr. Rodriguez would have testified that he had treated Boykins for three years while Boykins was a patient at Chattahoochee. He would have identified Boykins's condition as paranoid schizophrenia, an incurable disorder subject to remission and unpredictable relapse. He would have been able to relate to the jury the past effects of the disease on Boykins's behavior so that the jurors might have compared Boykins's prior symptoms to his actions on the day of the robbery. Moreover, where Dr. Rodriguez had extensive experience with Boykins, the other experts all based their opinions on single one-hour interviews. This Court has

> frequently stressed the importance of permitting introduction of all evidence relating to the issue of insanity. See United States v. McRary, 616 F.2d 181, 184 (5th Cir. 1980); United States v. Davis, 523 F.2d 1265, 1267 (5th Cir. 1975). In Gordon v. United States, 438 F.2d 858 (5th Cir. 1971), the Court stated that "[i]n resolving the complex issue of criminal responsibility it is of critical importance that the defendant's entire relevant symptomatology be brought before the jury and explained." Id. at 883 (emphasis added). Such evidence as was contained in Dr. Rodriguez's testimony clearly meets the constitutional standard of materiality in the sense of a "crucial, critical, highly significant factor."
>
> The State has advanced no competing interest in excluding Dr. Rodriguez's testimony. Nor does any spring to mind. As we have already observed, the evidence, more than merely relevant, was crucial to the jury's accurate resolution of the petitioner's sanity at the time of the crime. Furthermore, there is no suggestion that Dr. Rodriguez's testimony lacked trustworthiness. On the contrary, of all the experts who testified, Dr. Rodriguez was the most intimately familiar with Boykins's condition.

Boykins v. Wainwright, 737 F.2d 1539, 1544–45 (11th Cir. 1984).

To be sure, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Permitting a court to preclude any evidence of an affirmative defense of mental disease or defect at the pre-trial stage, based solely on conflicting expert testimony, risks undermining this crucial right. It is particularly important in the context of an insanity defense that all relevant evidence

be permitted to come in before a ruling is made. As the United States
Supreme Court noted in <u>Kahler</u>, "[d]efining the precise relationship
between criminal culpability and mental illness involves examining the
workings of the brain, the purposes of the criminal law, the ideas of free
will and responsibility. It is a project demanding hard choices among
values, in a context replete with uncertainty, even at a single moment in
time." <u>Kahler</u>, 140 S. Ct. at 1037.

Too, it remains noteworthy that in past cases, Alabama courts have
welcomed both expert and lay testimony on the issues of "mental
competency or sanity." <u>E.g.</u>, <u>Lewis v. State</u>, 380 So. 2d 970, 977 (Ala.
Crim. App. 1979). Family members, for example, can speak to a
defendant's past behavior. <u>Bowen v. State</u>, 386 So. 2d 489, 490 (Ala.
Crim. App.), <u>writ denied sub nom.</u> <u>Ex parte Bowen</u>, 386 So. 2d 492 (Ala.
1980) (in which defendant's father testified regarding his son describing
hallucinations to him and being out of touch with reality).

Excluding evidence of an insanity defense based solely on
conflicting testimony at a pretrial hearing risks interfering with the
jury's constitutional role as the trier of fact. Again, as no less an authority
than the Supreme Court of the United States has recognized, "the right

to trial by jury [is considered] 'the heart and lungs, the mainspring and the center wheel" of our liberties, without which "the body must die; the watch must run down; the government must become arbitrary.'" <u>United States v. Haymond</u>, 204 L. Ed. 2d 897, 139 S. Ct. 2369, 2375 (2019). Indeed that is what happened here. The trial court's decision to weigh the evidence and allow the presentation of Mr. Thompson's affirmative defense only if he "proved" the defense at the pre-trial hearing improperly invaded the jury's fact-finding role. By choosing which expert to credit and denying the defendant the ability to present lay witnesses regarding his mental capacity, the court exceeded its gatekeeping function, and instead usurped the role of the jury.

This issue was exacerbated by the trial court's clear – and undisputed – application of the incorrect standard for assessing the quantum of proof during the pretrial hearing. As explained above, in Alabama, "[i]t is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts." Ala. Code § 13A-3-1(a). Thus, there are two prongs to this affirmative defense:

-27-

(i) the defendant must have had a mental disease or defect at the time of the commission of the alleged acts; and (ii) the mental disease or defect must have rendered the defendant unable to appreciate the nature and quality or wrongfulness of his acts.

It is undisputed that Mr. Thompson had a "mental defect" at the time of the alleged crime, i.e., that the first prong of his defense was satisfied. (C. 1141-42 ("[B]oth experts . . . indicated the Defendant had a mental defect. The mental defect was moderate intellectual disability, which was formerly called moderate mental retardation.").) The parties disputed, however, whether Mr. Thompson could have appreciated the criminality of his conduct, i.e., whether the second

prong of his defense was satisfied.

As explained above, this dispute was resolved after the state filed a motion in limine to preclude all evidence of Mr. Thompson's mental disability, on the basis that the defense's evidence was insufficient. (C. 940.) Again, this at a time when no evidence had been presented to a jury. After the pre-trial hearing discussed above, the circuit court then effectively issued a directed verdict against Mr. Thompson's mental disease or defect defense by granting the state's motion in limine. In so

doing, the trial court did <u>not</u> rule that Mr. Thompson had presented <u>no</u> evidence of his affirmative defense but that he had "not proven by . . . clear and convincing evidence" that the mental defect caused Mr. Thompson not to understand the wrongfulness of his conduct.

Even the Alabama Court of Criminal Appeals found this was wrong. (<u>See</u> Doc. 2-4, at 11.) However, it then relied on supposed "harmless error" and endorsed the trial court's use of a pre-trial proceeding to exclude the mental health evidence from the jury altogether. This decision was erroneous in several ways. First, the court held that there was "no evidence" to support the defense. (<u>See</u> Doc. 2-4, at 11.) This was itself an improper weighing of the evidence that was presented during the pre-trial proceeding.

The evidentiary record that was developed unquestionably demonstrates that there was indeed "some evidence" from which a reasonable jury could infer that Mr. Thompson's intellectual disability inhibited his understanding of the wrongfulness of his conduct. Specifically, beyond agreement from both experts that Mr. Thompson suffered from an intellectual disability, Dr. Walker's report, which was entered into evidence at the pre-trial hearing, detailed that Mr.

Thompson had impaired social skills, which include "interpersonal skills, social responsibility, self-esteem, gullibility, naivete (wariness), and ability to follow rules/obey laws and to avoid victimization, and social problem solving." (C. 914.) Dr. Walker testified that Mr. Thompson's social skill deficits impede his ability to think abstractly, including thought that requires "a level of inference" and his understanding of what it means to "be good." (S. 769:19–770:20.)[9] Dr. Walker also testified that Mr. Thompson "could not understand why he was terminated from a job for showing up late" because "he didn't have that ability to think forward to how [his actions] might affect his coworkers and that sort of thing." (S. 771.)

To be sure, Dr. Walker expressly did not render a conclusion on the ultimate issue—whether Mr. Thompson met the second prong of the Alabama insanity test—believing that an issue for the jury to decide. But the Court of Criminal Appeals confused Dr. Walker's reticence to opine

---

[9] Dr. Walker testified that Mr. Thompson's "deficits in conceptual skills, social skills, as well as practical skills" mean that Mr. Thompson "is very concrete in his interactions. He does not think abstractly." (S. 769:19–770:20.) Dr. Walker further explained the meanings of concrete and abstract thinking: "a parent tells a child be good. Good is abstract. Concrete is don't kick the dog. So it is that level of – it is making a level of inference." (S. 770:17–20.)

on the ultimate issue for a lack of <u>evidence.</u> That was wrong: for the reasons just discussed, Dr. Walker's testimony about the factual components of Mr. Thompson's condition certainly constituted some evidence that he was unable to appreciate the wrongfulness of his conduct. Ultimately, the Court of Criminal Appeals' conclusion of "no evidence" added yet another layer of gloss to the trial court's resolution of factual and evidentiary conflicts that were for the jury to resolve.

Moreover, and perhaps more importantly, the Alabama Court of Criminal Appeal's conclusion violated Mr. Thompson's due process guarantee in other ways. At bottom, the decision is inconsistent with <u>Boykins</u> in that it endorses a pre-trial weighing of the sufficiency of the evidence relevant to the insanity defense before deciding whether any of it could be presented to the jury. In particular, the court affirmed the trial court's order excluding not only Dr. Walker's testimony, but <u>any</u> evidence relating to mental defect, on the grounds that Mr. Thompson "did not present evidence sufficient to submit a defense of not guilty by reason of mental disease or defect to the jury." Under <u>Boykins</u>, though, Dr. Walker's testimony—along with relevant lay testimony—would have been permitted to be presented to the jury as a matter of Due Process.

Consequently, the determination that Mr. Thompson's constitutional rights were not violated was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "[were] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Based on the foregoing, this Court should grant Mr. Thompson's petition for a writ of habeas corpus and order a new trial.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Petitioner prays this Court:

1. Summarily grant Mr. Thompson's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and order new proceedings; or, in the alternative hold a hearing on this petition; and/or

2. Provide any relief this Honorable Court deems fair and equitable.

Respectfully submitted,

*/s/ Lisa M. Ivey*
Lisa M. Ivey (asb-2264-a36i)
Attorney for Petitioner

*OF COUNSEL:*
**STUBBS, SILLS & FRYE P.C.**
1724 South Quintard Avenue
Post Office Box 2023
Anniston, Alabama 36202
Phone: (256) 835-5050
Email:  lisa@stubbssillsfrye.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that the following has been served a copy of the foregoing document, on the 30th day of November 2022, by placing the same in the U.S. mail, postage prepaid and properly addressed; or, if the party being served is a registered participant in the ECF System of the United States District Court for the Northern District of Alabama, by a "Notice of Electronic Filing" pursuant to N.D. Ala. Local Rule 5.4:

Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, Alabama 36130

Phyllis Morgan
Warden, William E. Donaldson Correctional Facility
100 Warrior Lane
Bessemer, Alabama 35023-7299

*/s/ Lisa M. Ivey*
Lisa M. Ivey (asb-2264-a36i)

-33-